

## IN THE UNITED STATES DISTRICT COURT
## FOR THE STATE OF SOUTH DAKOTA

| | |
|---|---|
| MARTY NOBLE AND HOLLI TELFORD <br><br> Plaintiffs <br><br> v. <br><br> AMERICAN NATIONAL PROPERTY & CASUALTY INSURANCE CO; BOARD-WALK PROPERTY MANAGEMENT CO., KEVIN WEST, LEHI OASIS, LLC; DAVID L PARKER, AUSTIN B. CALES; JARED ELDRIGE in his official Capacity, LARRY DEITER in his official official capacity as Director for the Division of Insurance for the state of South Dakota, ROBERT J. POULSEN and POULSEN & SKOUSEN <br><br> Defendants | CIVIL No. **5:17-cv-5088** <br><br> **DECLARATION OF HOLLI TELFORD IN SUPPORT OF OPPOSITION TOO AND MOTION TO STRIKE AMERICAN NATIONAL's "ANPAC"'s MOTION TO SET ASIDE ENTRY OF DEFAULT AND SPECIAL APPEARANCE PETITIONS AS FRAUDULENTLY BASED** |

**COMES NOW,** Holli Telford, under penalty of perjury pursuant to 28 USC section 1746(2), to attest and state as follows:

1. I am the Plaintiff in this matter that carried on communications with the South Dakota Dept. of Insurance both by phone and via email with the Department's purported Counsel, Clayton Grueb regarding the subject matter of this litigation.

2. I am Opposing as well as seeking to strike the false and deceptive papers filed by Attorney for American National Property and Casualty Insurance "ANPAC" in this matter, Gregory John Sperlich, as deceptive and fraudulent.

3. As set forth in my Motion for entry of Default against ANPAC and filed with this court ten days after statutory default was committed, I served ANPAC's statutory agent of service, the Director of the Division of Insurance, Larry Deiter with 2 copies of the summons,

1

2 copies of the First Amended Complaint, 2 copies of admissions to service by mail referred to in my email communications to Clayton Grueb as the "two returns I also sent you", see Doc. 32-2, PageID #: 240, an instruction letter and a $10 administrative fee which was cashed by my bank. The foregoing documents were attached to Attorney Sperlich's affidavit and memorandum to vacate the default.

4. In the same affidavit of Attorney Sperlich, Sperlich provides a judicial admission the we (plaintiffs) properly served the Dept. of Insurance Director via mail and **that the Dept admitted service by mail** at: Doc. 32-2, PageID #: 239, first paragraph. In this same first paragraph at: Doc. 32-2, PageID #: 239, **the Department's counsel GRUEB also admitted that the letter produced at Doc. 32-1 by the Department of Insurance was a fraud** in the following statement:

> I must apologize for my embarrassing oversight. You are correct and there were two copies of the summons and complaint in your mailing. **The Division has admitted service** and is forwarding the summons and complaint to American National and Property Casualty Ins. Co. today.

5. Attorney GRUEB's emailed admission came after I told him that the service had been taped, that I had three witnesses to the mailing, Doc. 32-2, PageID #: 240, and AFTER I filed still shots of my services on the remainder private party defendants into the court's record, the latter defendants who falsely claimed that they were served with the original 16 page complaint in this matter as opposed too, the First Amended Complaint comprising of 88 pages.

6. Attorney Sperlich falsely indicates that the emails between myself and department attorney GRUEB were dated between the dates of December 13, 2017 to December 17, 2017. In fact these emails were dated between December 15, 2017 to December 17, 2017 as shown by Sperlich's Doc. 32-2.

7. There has been no changes in the service procedures that we employed upon the South Dakota Insurance Director re ANPAC on November 28, 2017 when we effected initial service, and the date Dept. of Insurance employee Eva Briggs admitted service in her December 18, 2017 letter **issued to correct the fraud committed in GRUEB's December 13, 2017 letter at PageID #: 237.** Accordingly, service was admitted upon receipt of our process in November of 2017 by the Director, Larry Deiter. Furthermore, there is no statutory provision that allows the Department of Insurance for South Dakota as an agent, to

2

withhold service of court process for three weeks before effecting service on the principal defendant.

8. Most importantly, Attorney Sperlich has intentionally omitted evidence from his affidavit that we (plaintiffs) including myself, expressly notified GRUEB once the fraud had been uncovered, that we were not agreeing to extend service. See exhibit "1" attached. Accordingly GRUEB had direct knowledge that we intended to apply for default in this matter, Our motion for default was filed on December 28, 2017, ten days AFTER ANPAC was in default upon service to her statutory agent, director Larry Deiter.

9. Attorney Sperlich's fraud offenses do not stop here. Attorney Sperlich is correct in asserting that he needs to prove the following elements to avoid the default, to wit: (1) whether the conduct of the defaulting party was blameworthy or culpable, (2) whether the defaulting party has a meritorious defense, and (3) whether the other party would be prejudiced if the default were excused". *Stephenson v. El-Batrawi*, 524 F.3d 907 (8th Cir. 2008).

10. Attorney Sperlich asserts in his memo supporting ANPAC's motion to vacate the default that because I knew that the Department had not yet served ANPAC, that this somehow excuses ANPAC's default. PageID #: 247. I disagree. IT IS CLEAR FROM ALL OF THE EVIDENCE ATTACHED TO SPERLICH's affidavit that Director Deiter and his employees sought to conspire with ANPAC to deprive me (us) of jurisdiction over our federal claims, including a RICO claim, in the state of South Dakota. I even threatened to add department officials and GRUEB to my RICO complaint because of this conspiracy. See Doc. 32-2, PageID #: 238. ANPAC was part of this conspiracy to obstruct justice in this forum based on service fraud and using the wires to defraud us of our causes of action, the latter which constitutes RICO property. See **Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982)** (a Cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause. [Footnote 4]); DECK v. ENGINEERED LAMINATES, 349 F.3d 1253 (2003) (RICO claim stated where the defendant sought to extinguish a cause of action against them through RICO predicate acts.). It is also well established that a defendant is committed by the acts of it's agents.

11. Accordingly, since service was properly effected on November 28, 2017 on ANPAC's statutory agent, then ANPAC was required to respond by December 19, 2017 and we (plaintiffs) should not be held at fault for the defendants conspiratorial acts to obstruct

3

jurisdiction in this forum by service fraud and in employing the wires to effect this fraud. Moreover, this court should not sustain the defendant's fraud by granting ANPAC's motion to vacate and thus setting precedent for any insurance company to avoid prosecution by simply conspiring with Department employees to effectively reject service when all protocols were followed.

12. ANPAC then states at PageID # 247 that the court is required to consider prejudice to the Plaintiffs when vacating a default and has surreptiously continued ANPAC's response date to January 8, 2017. I contend that the attempted scheme to commit service fraud by denying what was actually served on the director on November 28, 2017 and thereby artificially inflate the time to respond; has severely prejudiced me because ANPAC has not reinstated my auto insurance policy under its original terms and has thereby forced me to secure other avenues of transportation to protect against 4th amendment seizures given I cannot afford the quadruple insurance rates I would now be forced to pay as a result of ANPAC's illegal lapse of my auto policy. Hence ANPAC's fraudulently concocted delay is and was clearly prejudicial.

13. In addition, ANPAC's service fraud follows suit with the service fraud committed by the remainder defendants as previously identified by us in our several petitions for a contempt hearing against the other defendants. **It is undisputed that all defendants in this matter have lied to this court about what documents they were served in order to avoid this court's jurisdiction over their persons.** Moreover, ANPAC has furthered this fraud in her motion to vacate the default by fraudulently advancing a service defect under FRCP rule 4(d) which ANPAC's own evidence recorded into this record by wire, shows was false as the Director of Insurance ADMITTED TO SERVICE ALIBIET THREE WEEKS AFTER THAT ADMISSION ACTUALLY OCCURRED. The filing of documents agreeing to admission of service (albiet fraudulently late) defeats and MOOTS the subsequent special appearance motion made by ANPAC's counsel Sperlich, at least in regards to the personal jurisdiction issue. See **Commercial Cas. Ins. Co. v. Consolidated Stone Co., 278 U.S. 177 (1929)** (a Defendant may make a voluntary appearance by affirmative conduct before the court); "Actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not." Adam v. Saenger, 303 U.S. 59 (1938); Hess v. Pawloski, 274 U.S. 352, 356 (1927)("Challenges to personal jurisdiction or venue may be waived by either express or implied conduct.); Quenzer v. Quenzer, 653 P.2d 295 (Wyo. 1982)(once made, a

general appearance may not be revoked by subsequent actions of filing a Notice of Non-participation. citing Weaver Construction Company v. District Court in and for El Paso County, 4th Judicial District, 190 Colo. 227, 545 P.2d 1042(1976)). Hence in regard to filing an attack re personal jurisdiction over ANPAC, this defense has now been waived by ANPAC.

14. Furthermore, contrary to ANPAC's contentions, ANPAC does not have meritorious defenses under a purported "lack of subject matter jurisdiction defense." Our federal claims against ANPAC include violations of: the Federal Racketeering Act, "RICO", 18 USC section 1961, et seq.; the Electronic Funds Transfers Act, 15 U.S. Code § 1693, and the Fair Credit Reporting Act, 15 U.S. Code § 1691. (See pg. 1 of FAC). ANPAC only addresses one of these claims, i.e. the Electronic Funds Transfers Act, 15 U.S. Code § 1693 to support a fraudulent assertion that this court lacks subject matter jurisdiction.

> See PageID #: 247- 248 where ANPAC argues:
> **ANPAC is an insurance company and cannot be in violation of the Electronic Funds Transfers Act** which only applies to financial institutions which are defined as state or national banks, state or federal savings and loan associations, mutual savings banks, credit unions, **or any person who holds an account belonging to a consumer.** 12 C.F.R. 205.3(a). ANPAC. . .[is not a financial institution] . . . nor does ANPAC have access to a device to permit a consumer to initiate electronic funds transfers as required by 12 C.F.R. 205.2(a)(1) (defining an access device).

15. First and foremost, ANPAC is defined as a financial institution under 31 U.S. Code § 5312(a)(2)(M) as shown in exhibit "2" attached. Second access to a device to permit a consumer to initiate electronic funds transfers. . . also includes an agreement constituting the access device. See 12 CFR § 205.2. Definitions.

> For purposes of this part, the following definitions apply:
> (a) (1)Access device means a card, code, **or other means of access to a consumer's account, or any combination thereof, that may be used by the consumer to initiate electronic fund transfers.**
> (2) An access device **becomes an accepted access device when the consumer:** (i) Requests and receives, or **signs, or uses (or authorizes another to use) the access device to transfer money** between accounts or to obtain money, property, or services;

In this action, HOLLI admitted that she signed an agreement to allow ANPAC to transfer specified amounts of money from her bank account to ANPAC's bank account in return for insurance services. See allegations of the FAC:

para. 29 of the FAC reads:

5

Upon HOLLI agreeing to the premium amounts to be charged for homeowner's coverage, automobile coverage and trailer coverage, HOLLI agreed to automatic withdrawals from her credit card account of no more than $82.07 per month for all of these coverages commencing April 8, 2017. An ANPAC agent sent HOLLI notice of the monthly autopay amounts to be withdrawn from her credit card account. See exhibit "7" attached.

16. **Exhibit "7" attached to the FAC IS ANPAC'S ADMISSION OF AN ACEPTED ACCESS DEVICE.**

17. Moreover, ANPAC's liability under the EFTA in spite of ANPAC's identification as a financial institution under the banking code (ex. "2" attached) is further established under this act as. . . **any person who holds an account belonging to a consumer.** 12 C.F.R. 205.3(a). There is no question that ANPAC held an insurance risk account in HOLLI's favor. Moreover, other federal court's have identified persons within the meaning of the EFTA **to include fitness companies** who enter into contracts with consumers, see exhibit "3" attached, Wendorf v. Landers, 755 F. Supp. 2d 972 (N.D. Ill. 2010); Friedman v. 24 Hour Fitness USA, Inc., 580 F. Supp. 2d 985 (C.D. Cal. 2008) (RICO claim and EFTA claim sustainable against defendant; the latter as Plaintiffs' claim arises under section 1693m, which provides for civil liability as against persons other than financial institutions. 15 U.S.C. § 1693m ("Except as otherwise provided, any person who fails to comply..."); **to include internet companies and their telemarketers,** see Wike v. Vertrue, Inc., 566 F.3d 590 (6th Cir. 2009), see material portions attached hereto as exhibit "4"; Terry Johnson v. West Suburban Bank Tele-Cash Inc. County Bank of Rehoboth Beach, Delaware Tele-Cash Inc. County Bank of Rehoboth Beach, Delaware, 225 F.3d 366 (3rd Cir. 2000) (EFTA applies to **companies loaning monies**.) . . .and other entities as set out by federal authorities and which Holli will not attach to stay within the 25 page limitation rule of this court. **HENCE ANPAC HAS DELIBERATELY AND FRAUDULENTLY REPRESENTED TO THIS COURT THAT THE EFTA HAS NO APPLICATION TO ANPAC. THIS ONGOING FRAUD DESERVES TO BE TREATED HARSHLY BY THIS COURT AS AN EFFORT TO DEPRIVE PLAINTIFF HOLLI OF HER CAUSES OF ACTION AGAINST ANPAC.**

In addition, that ANPAC committed material violations of the EFTA by failing to obtain HOLLI's written consent authorizing alteration to the terms of HOLLI's EFTA agreement with ANPAC is further set out in Plaintiff's FAC:

Para. 34 of the FAC reads:

ANPAC deceptively and fraudulently unilaterally canceled HOLLI's auto and trailer policies without HOLLI's written consent as required under both the Electronic Funds Transfers Act access device agreement and the insurance policies, and also failed to give HOLLI written notice of these cancellations as required under the insurance policies and regulations promulgated generally by state insurance commissions. To further coverup their deception, ANPAC reduced the premium amounts automatically withdrawn from HOLLI's bank account to approximately $73 per month which were the originally agreed coupled insurance premiums for both the homeowners insurance and the insurance on two motorized vehicles. Hence when this corrected premium was collected from HOLLI's bank account In August of 2017, HOLLI was deceived into believing that ANPAC had partially corrected the electronic funds transfer issues on all insured properties except her trailer. HOLLI would learn approximately three weeks later when reporting malicious vandalism on her car which occurred on the park's premises, that ANPAC had doubled HOLLI's homeowners insurance premium without HOLLI's consent and unilaterally lapsed HOLLI's auto and trailer policies; to thereby (1) defeat any comprehensive coverage for the vandalism on her 1998 honda civic, (2) prevent HOLLI from obtaining like coverage from another insurer due to the reported lapse without paying quadruple premiums for the same coverage, (3) prevent HOLLI from insuring additional vehicles on her policies, (4) put HOLLI at risk of 4th amendment seizure and imprisonment for driving without insurance, and (5) cause other collateral injuries associated with the loss of insurance.

18. Finally, in attacking this court's subject matter jurisdiction, ANPAC makes no mention of Plaintiff's RICO claims against ANPAC.

Para. 32 of the FAC reads:
This action sues ANPAC for racketeering conduct re overcharges in HOLLI's insurance premiums, for diminishing the value of at issue insured properties covered to -0- without HOLLI's written consent and knowledge in order to aid and abet an illegal abandonment scheme exercised by the OASIS defendants.

19. A number of federal courts have found that inflating insurance premiums over market rate will justify a RICO claim when the premiums are paid by mail or wire. See Dornberger v. Metropolitan Life Ins., 961 F.Supp. 506, 523 (S.D.N.Y.1997) (finding a RICO injury because plaintiff "was fraudulently induced to pay premiums for services she did not receive but she bargained for/); Klay v. Humana, Inc., 382 F.3d 1241, 1259 (11th Cir. 2004) (physicians had contracted with defendants to receive reimbursement for medical services, but defendants engaged in a scheme to underpay plaintiffs' reimbursements when compared to other market rates). Cannon v. Wells Fargo Bank, N.A., No. C-12-1376, 2014 WL 324556, at *3 (N.D.Cal. Jan. 29, 2014) (Finding RICO violation properly alleged where bank was

accused of charging insurance premiums that were two times the market rate.) Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906) ("[The city] was injured in its property, at least ... by being led to pay more than the worth of the pipe."); Neff v. Provident Life and Accident Insurance, 2:14-cv-06696-MMB (E.D. PA, 2014) (Atty sued for theft of attorney fees provided under contract for the settlement of insurance claims, using RICO). See ex. "5" attached for RICO conviction for overcharge acts.

20. Finally, under the Fair credit reporting act, ANPAC unilaterally lapsed Plaintiff's auto policies under a false theory that Plaintiffs had not paid her premiums. HOLLI made numerous demands upon ANPAC to correct this corrupt conduct. Given the accepted access device agreement HOLLI tendered to ANPAC to pay only the agreed contracted rate of insurance on her auto policies was HOLLI's timely tender of payment and HOLLI holds no responsibility for ANPAC manipulating that access agreement for transfer of payments, it is undisputed that ANPAC fabricated a basis for falsely reporting HOLLI's credit worthiness. HOLLI has therefore clearly stated FCRA claims against ANPAC thereby making ANPAC's special appearance motion purporting to attack this court's subject matter jurisdiction, yet another act of fraud upon this court as well as a RICO instrument recorded by wire with this court to obstruct the due administration of justice.

21. ANPAC admits that where setting aside the default would prejudice the plaintiff by way of permitting fraud and collusion to win the day, the default should not be set aside. *Berthelsen v. Kane*, 907 F.2d 617, 621 (6th Cir. 1990). Given the record clearly shows that ANPAC first attempted to commit service fraud and then later attempted to commit subject matter fraud by both intentionally misstating the facts and laws with respect to the matters before this court, this court should not condone that criminal behavior by vacating the default which Plaintiffs had every right to systematically pursue and even gave ANPAC notice that they intended on doing so through ANPAC's statutory agent. Refer back to exhibit "1" attached.

I declare that the foregoing is true and correct under penalty of perjury pursuant to 28 USC section 1746(2), executed this 4th day of January, 2018.

*Holli Telford*

CERTIFICATE OF SERVICE
Service of this declaration is effected through the ECF filing system