# IN THE UNITED STATES DISTRICT COURT
# FOR THE STATE OF SOUTH DAKOTA

| | |
|---|---|
| MARTY NOBLE AND HOLLI TELFORD<br><br>Plaintiffs<br><br>v.<br><br>AMERICAN NATIONAL PROPERTY & CASUALTY INSURANCE CO; BOARD-WALK PROPERTY MANAGEMENT CO., KEVIN WEST, LEHI OASIS, LLC; DAVID L PARKER, AUSTIN B. CALES; JARED ELDRIGE in his official Capacity, LARRY DEITER in his official official capacity as Director for the Division of Insurance for the state of South Dakota, ROBERT J. POULSEN and POULSEN & SKOUSEN<br><br>Defendants | CIVIL No. **5:17-cv-5088**<br><br>**MOTION TO STRIKE AND OPPOSE AMERICAN NATIONAL PROPERTY AND CASUALTY INSURANCE'S "ANPAC'S" MOTION TO DISMISS; [DOC. 41], ANPAC'S MEMORANDUM IN SUPPORT OF MOTION DISMISS UNDER RULE 12(B)(6) [DOC. 42]; AND ANPAC'S MOTION FOR EXTENSION OF TIME, ON THE FOLLOWING GROUNDS;**<br><br>(1) **THE MEMORANDUM VIOLATES D.S.D. Civ. LR, 7.1(B)(1) IN THAT IT IS WELL OVER THE COURT'S 25 PAGE LIMIT**<br><br>(2) **THE MOTION AND MEMORANDUM ARE NOT PERMITTED TO BE FILED AT THIS TIME GIVEN THE PENDENCY OF A "DEFAULT" AGAINST ANPAC WHICH HAS NOT BEEN RELEASED**<br><br>(3) **THE MOTION IS PREDICATED UPON FALSE STATEMENTS WIRED TO THIS COURT BY ANPAC'S COUNSEL FOR THE PURPOSE OF OBSTRUCTING JUSTICE IN THIS MATTER IN FURTHER VIOLATION OF RICO**<br><br>(4) **THE MOTION IS BASED ON EVIDENCE RECENTLY FABRICATED BY ANPAC** |

1

COMES NOW Plaintiffs to move this court to strike AMERICAN NATIONAL PROPERTY AND CASUALTY INSURANCE "ANPAC'S" Motion To Dismiss, Memorandum in support of the Motion To Dismiss and Request for extension of time on the following stated grounds:

(1) The Memorandum violates D.S.D. Civ. LR, 7.1(B)(1) in that it is well over the 25 page limitation under the local rule;

(2) The Motion and Memorandum are not permitted to be filed at this time given the pendency of a default against ANPAC which has not yet been released;

(3) The motion is based on false statements of fact and law wired into the Court by ANPAC's counsel for the purpose of obstructing justice in this matter in further violation of RICO;

(4) The Motion is based on evidence recently fabricated by ANPAC; also a violation of RICO under the witness tampering act, 18 USC section 1512.

## I.  A MOTION TO STRIKE FALSE OR IMPROPER MATTER IS PERMITTED

FRCP Rule 12(f) permits any party to move to strike any matter from a pleading which false, impertinent or insufficient. Rule 11 allows this court to strike a whole pleading if it is a bedlam of false matter matter intended to deceive this court or if the pleading as a whole is improper. For the following reasons the three documents cited supra should be stricken.

### 1. The Memorandum violates D.S.D. Civ. LR, 7.1(B)(1)

D.S.D. Civ. LR, 7.1(B)(1) provides in part:
Briefs and any attachments other than documentary evidence attached in accordance with D.S.D. Civ. LR 56.1 (A) **must not exceed 25 pages or 12,000 words** unless prior approval has been obtained from the court.

ANPAC has made evidently clear in their memorandum supporting their motion to dismiss that they are not seeking to convert their motion to dismiss into a summary judgment motion; irrespective that ANPAC is still in default and has no right to even make a motion to dismiss. ANPAC's entire motion to dismiss with attachments in well over 25 pages. Given this rule violation, ANPAC is in violation of the D.S.D. Civ. LR, 7.1(B)(1) and ANPAC's memorandum must be stricken.

Moreover, this Court issued a sanction against Plaintiffs denying them the right to file electronically for this same over page violation WHICH OCCURRED BEFORE ANOTHER COURT WHO WAIVED THIS CONTEMPT VIOLATION GIVEN ALL PARTIES VIOLATED THIS OVER PAGE RULE, AND IN SPITE OF THE FACT THAT THIS COURT HAD NO JURISDICTION OVER THE OUT OF COURT CONTEMPT MATTER. This court should

therefore impose the same sanctions against ANPAC's counsel in this case for committing the same OVERPAGE violation AND BAR ANPAC FROM ELECTRONICALLY FILING DOCUMENTS; less this court violate Plaintiff's equal protection rights in this case.

## 2. The Motion And Memorandum Are Not Permitted To Be Filed At This Time Given The Pendency Of A Default Against ANPAC Which Has Not Yet Been Released

On December 28, 2017, this Court entered the default of ANPAC, ten days after ANPAC defaulted in appearance. The Insurance Department admittedly held onto plaintiffs summons and First Amended Complaint from November 27, 2017 to December 18, 2017 because the Insurance Department's Attorney GRUEB was hoping to lure Plaintiffs into dismissing their claims against ANPAC from the outset, while acting as ANPAC's defacto attorney. **The default rules do not permit a defendant party's agent to hold onto process until the agent "clues in" that Plaintiffs are not going to waive their rights to demand a timely answer or response.** HOLLI emailed defacto Attorney GRUEB notice that Plaintiffs were not extending the time for ANPAC's answer or response on December 18, 2018, see Doc. 38-1, PageID #: 282. The default was not entered until 10 days after ANPAC's default. ANPAC did not make their appearance until after Plaintiffs filed photos evidencing the service fraud committed by the remainder defendants. The timing of the events is very telling and does not show a good faith effort by ANPAC to appear and respond. In fact, ANPAC was relying on this Court to excuse all defendants service fraud.

NEVERTHELESS, until this court hears the default matter preferably by hearing, IT IS CLEARLY IMPROPER FOR ANPAC TO HAVE FILED ANY MOTION TO DISMISS OR MOTION FOR EXTENSION OF TIME (which motion was filed on January 8, 2018 and seeks an extension till January 8, 2018 in which to respond to Plaintiff's FAC).

## 3. ANPAC's Motion To Dismiss Is Based On False Statements Of Fact And Law Wired Into The Court By ANPAC's Counsel For The Purpose Of Obstructing Justice In This Matter In Further Violation Of The RICO Act

ANPAC corruptly opens their motion to dismiss by asserting that HOLLI has been declared a vexatious litigant in several forums; an escape goat used by every opposing attorney when they truly have no defense for their's or their client's illicit conduct. This court is already aware of the pre-filing orders ENTERED EX PARTE against HOLLI and that HOLLI

3

maintains that every pre-filing order is VOID AB INITIO. Nevertheless, these pre-filing orders have nothing to do with this action nor do these void orders sanction the fraud that has been committed by ANPAC to date.

ANPAC's fraud is furthered by the false claim that South Dakota has no jurisdiction over Plaintiff's properties, even the trailer registered in the state of South Dakota on South Dakota property owned by Plaintiff HOLLI in part (see exhibit "6" attached to FAC) because the insurance on that property was included into the single Idaho policy constructed by ANPAC's agent, even though the agent knew the trailer would be lived in . . . in the state of South Dakota on property owned by HOLLI in part.

ANPAC then proceeds on a number of arguments which fraudulently assert that HOLLI deceived the court which respect to insurance coverage when in fact sno such deception took place.

### A. TELFORD DID NOT MISLEAD THIS COURT IN ANY MANNER

#### 1. Telford Properly Followed The Redaction Rules To Protect Insured Properties While Coverage Was In Dispute

ANPAC argues that TELFORD mislead this court by redacting the address listed on her policies filed with this court. **IN FACT, ANPAC has violated the redaction rules** which provides under FRCP rule Rule 49.1 that **a party is permitted to redact addresses** on evidence filed with the court. HOLLI did redact the addresses from her policy as permitted by rule. Such redaction is intended to protect the insured property from harm while coverage is in dispute to prevent malicious injury.

#### 2. Telford AT NO TIME Represented In The FAC That ANPAC Insured Or Was Liable For the Injuries Done To The Utah Dwelling

**Having failed on their redaction accusation supporting a claim of deceit by Holli,** ANPAC next argued that HOLLI falsely represented that ANPAC covered the manufactured home in Utah that was damaged by the acts of the BOARDWALK defendants; of coarse without making any showing that HOLLI made any such allegations in her FAC, which she did not.

**In fact, the only reference to insurance coverage of the Utah dwelling allged in Plaintiff's FAC is made in paragraph 58 of the FAC, quoting:**

> 58. When NOBLE returned to her home in December of 2016, the home was invaded by these weed trees that had caused serious damages to the

4

structural integrity of the home. . . NOBLE and HOLLI contacted the then Park owner and demanded that repairs be made to the home. Gourley instructed Plaintiff HOLLI to make the repairs and **Gourley would reimburse HOLLI under his premise liability policy. . .** A bill was tendered to Gourley on or about March of 2017. **When Gourley next responded, it was to tell HOLLI that Gourley had sold the PARK to new owners who had assumed** all of Gourley's tenant contracts and **the insurance policy covering the PARK premises.**

**This allegation clearly places the liability for the injuries done to the Utah home upon the non-disclosed premise liability policy belonging to the PARK OWNERS, not ANPAC.**

    3.    **ANPAC's Denial That She Insured Any Property Located In Utah Was Patently False   Doc. 42, PageID #: 369**

**ANPAC denies that she insured any property in Utah.** ANPAC then denies that she insured the Utah dwelling. However as asserted supra, **TELFORD was not** claiming that ANPAC insured the Utah dwelling against any damages and the FAC made no such allegations.

The FAC however does allege that ANPAC insured Holli's 1998 Honda civic which was maliciously vandalized at BOARDWALK's Mobile Home Park in Utah. The following allegations in the FAC directly reference the "auto" property insured by ANPAC.

> 38. . . .ANPAC deceptively and fraudulently unilaterally canceled HOLLI's auto and trailer policies without **HOLLI's written consent as required under both the Electronic Funds Transfers Act and the insurance policies**, and also failed to give HOLLI written notice of these cancellations as required under the insurance policies and regulations promulgated generally by state insurance commissions. **HOLLI would learn of this cancellation approximately three weeks later when reporting malicious vandalism on her car which occurred on the park's premises,** . . .and that ANPAC had **unilaterally lapsed HOLLI's auto and trailer policies;** to thereby **(1) defeat any comprehensive coverage for the vandalism on her 1998 honda civic,** (2) prevent HOLLI from obtaining like coverage from another insurer **due to the reported lapse** without paying quadruple premiums for the same coverage, (3) **prevent HOLLI from insuring additional vehicles** on her policies, (4) **put HOLLI at risk of 4th amendment seizure and imprisonment for driving without insurance,** and (5) cause other collateral injuries associated with the loss of insurance.

Because **ANPAC did insure HOLLI's 1998 honda maliciously vandalized in the Utah while at BOARDWALK's property,** and by unilaterally lapsing the auto policy to avoid the duty to defend and to indemnify, then it follows that ANPAC necessarily lied in stating that she did not insure any property in Utah.

In addition ANPAC admitted that she insured Holli's trailer in South Dakota that is

5

presently uninsured due to the unilateral and unauthorized lapse in HOLLI's auto policy. In para. 39 of the FAC, HOLLI seeks the following relief with respect to that insured property. . .

> 39. HOLLI will be seeking . . .will be seeking other money damages against ANPAC for other torts, **plus an injunction directing ANPAC to immediately reinstate all of HOLLI's policies as originally agreed nun pro tunc to the date of original insurance, to add additional coverage to the polices and, to withdraw the lapse letter that ANPAC distributed to the insurance data base . . .**when receiving pricing of policies from other carriers..

### B. TELFORD Has Stated A RICO Claim Against the Defendants, Including ANPAC

ANPAC alleges at Doc. 42, PageID #: 371:
Plaintiffs fail to plead all of the elements of any RICO claim and, where they do touch upon an element, they merely recite conclusory allegations rather than provide any factual basis that could make the claim plausible. For those reasons, Plaintiffs RICO claims should be dismissed.

Plaintiff's have pleaded the following RICO facts in their complaint directed at ANPAC:

> Para. 32. **This action sues ANPAC for racketeering conduct re overcharges in HOLLI's insurance premiums, for diminishing the value of properties covered to -0- without HOLLI's written consent and knowledge** in order to aid and abet an illegal abandonment scheme exercised by the OASIS defendants. . . that OASIS and her agents conspired with ANPAC and her agents, to fraudulently strip HOLLI of insurance coverage to auto properties.
>
> Para. 38. In pursuit of that scheme, **ANPAC deceptively and fraudulently unilaterally canceled HOLLI's auto and trailer policies without HOLLI's written consent** as required under both the Electronic Funds Transfers Act and the insurance policies. . . To further coverup their deception, ANPAC reduced the premium amounts **automatically withdrawn from HOLLI's bank account to approximately $73** per month which were the originally agreed coupled insurance premiums for both the homeowners insurance and the insurance on two motorized vehicles. Hence when this corrected premium was collected from HOLLI's bank account In August of 2017, HOLLI was deceived into believing that ANPAC had partially corrected the electronic funds transfer issues on all insured properties except her trailer. HOLLI would learn approximately three weeks later when reporting malicious vandalism on her car which occurred on the Park's premises, that **ANPAC had doubled HOLLI's homeowners insurance premium without HOLLI's consent and unilaterally lapsed HOLLI's auto and trailer policies; to thereby (1) defeat any comprehensive coverage for the vandalism on her 1998 honda civic,** (2) prevent HOLLI from obtaining like coverage from another insurer due to the reported lapse **without paying quadruple premiums for the same coverage, . . .**
>
> Para. 39 . . .ANAC distributed their lapse letter to the insurance data base... to discourage competition with competing insurance bids.

Para. 41. At all times, Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3)...Plaintiffs allege that **the defendants associated in fact to create an criminal enterprise with common illicit objectives and goals,** of which Plaintiffs were the targets and victims. See Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir.2005) ("[T]here is no question that DuPont [corporation] and the law firms together can constitute an 'associated in fact' RICO enterprise."). The defendants and each of them managed the conduct of the Enterprise at certain relevant times and participated in it's affairs through a pattern of racketeering in violation of 18 U.S.C. § 1962(c).

Para. 42. "A pattern is shown through two or more related acts of racketeering activity that "amount to or pose a threat of continued criminal activity." United HealthCare Corp., v. Am. Trade Ins. Co., 88 F.3d 563, 571 (8th Cir. 1996)( Where Plaintiff alleges that the Defendants have participated in the related scheme in the past and that the practice continues into the present, Plaintiff has shown the pattern element sufficient to proceed on their RICO claim.)

44. The numerous predicate acts described herein were part of related **fraudulent schemes by Defendants designed to : (a) defraud Plaintiffs of money and properties under false pretenses;** (b) extort Plaintiffs of monies and properties in collusion with those acting under color of law; (c) **evidence tamper and file false statements before a court of law in pursuant theft of properties by deception; and (d) obstruct the due administration of justice in an official proceeding.**

45. Section 1961(1) of RICO provides that **"racketeering activity" is an act indictable under** any of the following provisions of Title 18, United States Code, § 1341 (relating to mail fraud), **§ 1343 (relating to wire fraud) and § 1346 (relating to scheme or artifice to defraud); § 1951 (relating to economic extortion). And § 1961(1)(a) (relating to any act which is chargeable under State law and punishable by imprisonment for more than one year.).** The underlying complaint herein alleges the defendants engaged in the following state law crimes. . .violations of South Dakota's theft by threat statute, S.D.C.L 22-30A-4 providing in part as follows: A person is guilty of theft if the person obtains property of another by threatening to: (6) Testify or provide information or withhold testimony or information with respect to another's legal claim or defense; SDCL 22-29, commits perjury and false statements; . . .and SDCL 37-24-6 Deceptive acts or practices using the mails or wires.

Para. 48. The defendants conspired to engage in acts of conpiracy which can be shown by circumstantial evidence. See U.S. Fire Ins. Co. v. United Limousine Serv., 303 F. Supp. 2D 432, 444.45 (S.D.N.Y.2004) **(Conspiracy to engage In unlawful acts Is shown by being in a position that allows the defendant to carry out a given plan and aiding in the implementation of that plan.)** Turkish v. Kasenetz, 27 F.3d 23, 28 (2d Cir.1994)). This is necessarily the case as "a knowing participant in a fraudulent scheme may be held liable both for his or her own acts of mail or wire fraud and **be held vicariously liable for the acts of co-schemers."** United States v. Manion, 339 F.3d 1153, 1156-57 (9th Cir. 2003) ; "Mail and wire fraud are identical offenses except for the particular method used to

disseminate the fraud". . ." **The 'scheme to defraud' element of mail and wire fraud is 'treated like conspiracy..'** Volkswagen, 2017 WL 4890594, at *11(citing Eclectic Props., 751 F.3d at 997).

It is clear from the foregoing allegations that Plaintiff HOLLI charged ANPAC with Racketeering violations **by repeatedly acessing the wires to overcharge HOLLI's bank account double premiums over and above what HOLLI had agreed to pay. . . and also wired a lapse letter to an insurance data base to discourage fair competing premium bids that were now quadruple the bids HOLLI had been originally promised by ANPAC as a result of the false lapse letter.**

A case prosecuted under the criminal RICO statute, i.e. USA v. JOHN PAUL GUTSCHLAG ,SR., no. 1:13CR00015 (W.D.VA, 2015) bears similar factual parterns as the allegations in this case. Attached as exhibit "1" to supporting Dec. of HOLLI is the relevant parts of the 23 page indictment entered in GUTSCHLAG case. Those allegations upon which Gutschlag was convicted and is presently doing a 18 year stint in prison plus paying a $1.2 million restitution judgment, show that :

> Gutschlag owned GM-Southwest Inc and that "GMS" provided services as an independent third-party administrator of student health insurance for colleges and universities across the United States. One of GM's client was Virgina Tech who subsidized a large portion of the health insurance premiums for participating graduate students and mailed the graduate student premiums to GMS's bank account in Roanoke, Virginia, on a regular basis. After conducting an accounting of the premiums received, and after deducting its commissions, GMS delivered the balance of the premiums to the carriers. Gutschlag subsequently orchestrated a fraudulent scheme to increase his financial coffers. Specifically, Gutschlag was responsible for creating actual paid claims/loss reports to the carriers and to his clients. Gutschlag accurately reported claims and losses to the carriers but falsely reported an inflated number of loss claims to Virgina Tech to create a higher loss ratio and thereby justify higher premiums from Virginia Tech. Gutschlag retained these higher premiums in his own accounts while paying the carriers the former significantly lower premium rates. Gutschlag then reported these inflated loss claims to an insurance data base to discourage competing bids from being submitted to Virginia Tech. Gutschlag was charged with racketeering, mail fraud, wire fraud, money laundering and receiving stolen property and convicted of these crimes.

Such is the case here. It is undisputed that ANPAC was given consent to only charge HOLLI $509 on an annual homeowners policy and $172 on a 6 month policy on HOLLI's vehicles. See ANPAC's exhibit "C" **first page only**, Doc. 42-3, PageID #: 401, showing these consented amounts -- to be divided by their monthly increments and accordingly charged against HOLLI's bank account at the calculable rate of $71.04 per month.

8

The original withdrawals from HOLLI's bank account were correct. Than commencing in April of 2017, ANPAC drew nearly double this amount out of HOLLI's bank account, at $136. HOLLI immediately contacted the agent and complained. The agent indicated that he would resolve the accounting error, but did not. When ANPAC drew another $136 out of HOLLI's account on May 8, 2017, HOLLI contacted the agent by email and threatened a lawsuit if the agent did not immediately revert the premiums back down to what HOLLI had originally agreed to pay. See exhibit "2" attached to supporting Dec. of HOLLI for this email. In August of 2017, ANPAC had purportedly corrected the error and was only charging HOLLI $72 per month out of HOLLI's bank account.

In September of 2017, as alleged in her FAC, HOLLI learned that ANPAC had unilaterally lapsed her auto policies and that the $72 being charged against her bank account represented solely the insurance premium on the homeowners policy, and WHICH WAS BEING DRAWN AT TWICE THE RATE HOLLI AGREED TOO. Holli contacted compliance personnel at ANPAC and threatened a racketeering lawsuit for stealing monies out of her bank account to which she did not approve. See email to elichilds @ American National attached as exhibit "3" to supporting Dec. of HOLLI. Eli Childs forwarded HOLLI to another number to address Her complaint. That number was not a working number for ANPAC, so HOLLI had to call back to get another contact for her complaint. See exhibit "4" attached to supporting Dec. of HOLLI for email to ANPAC about distributing a non-working number. Another email was sent to complain about the phone tag occurring in order to resolve ANPAC's fraud. See exhibit "5" attached to supporting Dec. of HOLLI. HOLLI's last email communication to ANPAC was directed to the manager of ANPAC's compliance department complaining about the same extortion and wire fraud tactics complained of in earlier emails and demanding that the lapse letter be immediately revoked, etc. This last email is exhibit "6" attached to supporting Dec. HOLLI. ANPAC since that date has continued the lapse on the auto and trailer policies and continued to charge HOLLI's bank account twice the premiums HOLLI consented to under the home policy.

Like in Gutschlag supra, the purpose in issuing the lapse letter was so that no other insurance carrier would offer HOLLI the competitive rates HOLLI initially agreed to in acquiring insurance from ANPAC and, in fact, every carrier HOLLI subsequently contacted sought to charge HOLLI 4 times the promised rates agreed to under HOLLI's contract with ANPAC. The wiring of the lapse letter alone to an insurance data base to bar competition on the premium rates was a RICO act in and of itself as determined by the Gutschlag court.

Moreover, every time a competitive insurer contacted the insurance database before giving HOLLI insurance quotes, another act of wire fraud occurred. At least 4 different carriers were contacted to provide HOLLI coverage after HOLLI learned of the lapse, thus four additional acts of wire fraud were committed. Furthermore ANPAC has continued to overcharge HOLLI's bank account for the house policy since April of last year resulting in another 9 counts of wire fraud for each month overcharged.[1] Finally since ANPAC illegally concelled the auto policy, ANPAC is liable for the malicious vandalism done to HOLLI's car as well as for any transportation costs HOLLI incurred for alternative transportation. Plus, ANPAC is liable for the lost sale of the truck at the charged amount of $25,000 as forwarned in HOLLI's email communications to ANPAC.

In ANPAC's motion to dismiss, ANPAC's claims that there is no fraud on ANPAC's part both because ANPAC had the right to increase HOLLI's insurance premiums due to an address error on HOLLI's application and because HOLLI consented to such increase in her consent contract identified as ANPAC's DOC. 42-3. **The SHAM in these statements in prima facially shown by ANPAC's own records:**

Specifically ANPAC admits to issuing an original auto policy to HOLLI that bore a **6 month premium rate of $172.** See Doc. 42-2, PageID #: 393. ANPAC then claims that ANPAC properly superseded the original policy with another policy **which charged HOLLI twice the insurance rates charged on HOLLI's original auto policy two months earlier,**

> "after ANPAC learned that the street address given by Telford in her application was incorrect"
> See Doc. 42, **fn. 2**, PageID #: 365

IN FACT, NO INCORRECT ADDRESS WAS GIVEN TO ANPAC and ANPAC's claims of an incorrect address are defeated by their own exhibits which identify the same exact address in the original car policy at doc. 42-2, PageID #: 393, as in the superseding policy issued two months later AFTER ANPAC accessed HOLLI's bank account and unilaterally doubled HOLLI's insurance premiums. See Doc. 42-2, PageID #: 395, for the

---

1. See Gregory P. Joseph, Civil RICO: A Definitive Guide, 58-59 (3d ed. 2010) ("As long as the pattern of racketeering activity has caused harm to the plaintiff's business or property, **the plaintiff has RICO standing.** The plaintiff is not obliged to plead or prove that it has been injured by multiple predicate acts, as long as the plaintiff has been injured by at least two predicate acts."); "Mail and wire fraud are identical offenses except for the particular method used to disseminate the fraud". . ." **The 'scheme to defraud' element of mail and wire fraud is 'treated like conspiracy in several respects.'** Volkswagen, 2017 WL 4890594, at *11(citing Eclectic Props., 751 F.3d at 997).

identical address.

With respect to ANPAC's second contention that HOLLI agreed to permit ANPAC to double her premiums by signing exhibit "C", i.e. HOLLI's consent agreement to withdraw premiums directly from her bank account, Doc. 42-3, PageID #: 401, HOLLI asserts that only the first page of consent agreement HOLLI signed and presented by ANPAC is authentic. The back side the consent agreement is a recent fabrication constructed by ANPAC to obstruct justice in this action. HOLLI verifies that she faxed her consent agreement to ANPAC on a very old fax machine. The first page of the consent agreement at PageID #: 401, clearly reflects that the document was faxed to ANPAC by the vertical and other markings on the consent agreement. The second page of the faxed agreement, PageID #: 402, shows absolutely no fax markings on this page because this page is a recent fabrication by ANPAC. In addition, HOLLI signs all pages of a contract as a matter of practice. The second page of the consent agreement, PageID #: 402, does not have HOLLI's signature applied thereto thus showing it as a forgery. Moreover, the second page of the consent agreement recently created by ANPAC **violates federal policy** because it purports to allow ANPAC to unilaterally alter a contract without HOLLI's (the consumer's) written consent in direct violation of the Electronic Funds Transfer Act's writing consent requirement PROVIDED TO THE CONSUMER ONLY. See **15 USC § 1693e.**
**Preauthorized transfers**

>  (a) A preauthorized electronic fund transfer from a consumer's account **may be authorized by the consumer only in writing (emphasis added),** and a copy of such authorization shall be provided to the consumer when made.

Under ANPAC's recently fabricated terms page, ANPAC purports to not only be the person entitled to change the terms of a preauthorization but ANPAC purports to be permitted to alter the terms without notice to the consumer, and at whim. See term (10) at PageID #: 402. **Because this terms page violated federal policy, it is null and void aside from the fact that it was recently fabricated.** Moverover, the terms page violates the terms of the auto policy itself with respect to the notice requirements in cancellations and the notice requirements under both Idaho and South Dakota law. Contrary to ANPAC's statement in fn 9 of their Doc. 42 that SDCL 58-15-8.2 only requires service by certified or registered mail of life insurance policies, attached as exhibit "7" to supporting Dec. of HOLLI is that statute which does not limit the types of policies to be served by certified /registered mail.

Alas, ANPAC having submitted the above mentioned fabricated evidence to this

11

federal court has now committed three additional racketeering predicate acts, First, document tampering in violation of 18 USC 1512, wire fraud in violation of 18 USC 1343, and attempted obstruction of justice, 18 USC 1503 or 1505.

### 1. Plaintiffs Have Pleaded The Existence of A Racketeering Enterprise

Para. 41 of the FAC states: At all times, Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3)...Plaintiffs allege that **the defendants associated in fact to create an criminal enterprise with common illicit objectives and goals,** of which Plaintiffs were the targets and victims. See Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir.2005) ("[T]here is no question that DuPont [corporation] and the law firms together can constitute an 'associated in fact' RICO enterprise.").

The illicit goal achieved by ANPAC while associating in fact with the BOARDWALK defendants was to lapse HOLLI's auto insurance policy so that when the BOARDWALK defendant seized Plaintiff's Utah dwelling and personal properties (the latter to include plaintiff's disabled honda insured by ANPAC) illegally in violation of federal law, ANPAC would be absolved from any liability therefore because of the unnoticed lapse of HOLLI's auto policy which occurred two days before BOARDWALK posted the notice to vacate the Park on the door of the Utah home. In addition, the lapse of the policy made it impossible for HOLLI to legally drive any moving vehicle or truck from the premises because HOLLI also was no longer insured to drive any vehicle. To further achieve this illegal objective of lapsing the auto policy, ANPAC took control over plaintiff's bank account by unilateral action. HOLLI has already identified at least 13 predicate acts of wire fraud supra, 1 act of document tampering and 2 acts of attempted obstruction of justice.

An association-in-fact enterprise "must have at least three structural features Boyle v. United States, 556, U.S. 938, 945-46 (2009):

(1) a purpose: here the purpose was to achieve the maximum properties to steal under a illicitly calculated abandonment scheme (i) making note that the vandalism of Plaintiff's vehicle made the car inoperable and therefore subject to abandonment at BOARDWALK's property, (ii) the inability to drive impeded Plaintiff's ability to move the personal properties before BOARDWALK seized these properties by self help procedures on November 9, 2017) and, (iii) lapsing the auto policy stripped HOLLI of all ability to seek coverage on her vehicle and some of her personal properties temporarily located in the Utah home; (2) relationships among those associated with the enterprise: ANPAC's relationship

to the scheme was core because without ANPAC's help to impede HOLLI's driving and indemnification abilities, the BOARDWALK defendants would not have been able to achieve as high as yeild in their abandonment schem,. And; (3) longevity sufficient to permit [the] associates to pursue the enterprise's purpose: the longevity of the defendants enterprise continues even into these proceedings to pursue the enterprises purpose of successfully stealing plaintiffs causes of action against the defendants for their illicit conduct through acts of wire fraud, evidence tampering and attempted obstruction of justice. Association and conspiracy can be circumstantially shown when the association is required to implement a successful RICO scheme. See U.S. Fire Ins. Co. v. United Limousine Serv., 303 F. Supp. 2D 432, 444.45 (S.D.N.Y.2004) (**Conspiracy to engage In unlawful acts Is shown by being in a position that allows another defendant to carry out a given plan and aiding in the implementation of that plan.**)

### 2. Plaintiffs Have Shown An Opened Ended Pattern Of Racketeering Activity

ANPAC claims that Plaintiffs cannot establish a long enough period to meet a close ended scheme because the BOARDWALK defendants didn't acquire the PARK until June of 2017 which makes the close ended period a matter of 5 months to the date of the eviction order. ANPAC further states that courts considering a close ended scheme have concluded that 5 months would be too short to meet the longevity requirement. ANPAC mis-states the beginning time that this RICO scheme dates back too.

It is undisputed that the FAC states that commencing in 2007, Plaintiffs disabled persons, entered into an accommodation agreement with the previous park owner to maintain Plaintiff's yard, especially the weed tree infestations. FAC para. 3 et seq. The FAC also state that commencing in January of 2014 to December of 2016, the tenant of the home left the property to seek specialized medical care out of state and that the former PARK owner violated the accommodation agreement by failing to upkeep the yard thus causing massive intrusion into Plaintiff's home and damage worth $38,000. FAC para. 6 et seq. The FAC also states that during this 2 year absence period, the former PARK owner was negotiating with the new park owner to purchase the PARK and that the BOARDWALK defendants were cognizantly aware that the Park had a weed tree infestation problem. The FAC states that the former park owner told HOLLI to repair the property, submit a bill to the former Park owner who would then tender the bill to his premise liability carrier. That by the time HOLLI tendered the bill to GOURLEY, GOURLEY reported that he had already conveyed the PARK

13

to the new owners as well as his premise liability policy. . . and to look to the new owners for compensation. See FAC, para. 58. The FAC alleges that HOLLI contacted the new owners and made a demand for damages and that in response thereto, the new owners sought to evict HOLLI and the home from the Park. See FAC, para. 59. The FAC also alleges that the weed tree threat was not resolved as HOLLI informed the new owners that there was another weed tree in the neighbors yard displacing the home and causing additional damages. See FAC, para. 58. Rather then correct the ongoing nuisances, the BOARDWALK defendants unlawfully initiated eviction proceedings illicitly associating in fact with immuned defendant state Judge Eldridge in his personal capacity only, to accomplish their illegal theft and extortion goals. The FAC states that Judge Eldridge did not have subject matter jurisdiction to initiate any eviction action against Plaintifts and that the eviction proceedings were a sham to criminally extort Plaintiffs of their properties. Finally, after the case was was filed, EVERY SINGLE DEFENDANT HAS COMMITTED AT LEAST TWO PREDICATE RICO ACTS TO OBSTRUCT PROSECUTION OF THIS CASE. . . WHICH NOW SEEKS MONEY DAMAGES ONLY - FOR THE TRANSITORY TORTS COMMITTED BY THE DEFENDANTS.

Based on the foregoing, the beginning of the scheme commenced in January of 2014, not when the BOARDWALK defendants purchased the property in May of 2017, and the scheme is still ongoing as the ultimate objective of the scheme now is to nullify Plaintiffs causes of action for money damages through ongoing acts of wire fraud, evidence tampering and attempted obstruction of justice. Therefore, Plaintiffs unquestionably meet the legivity requirement to establish a pattern of Racketeering activity.

### 3. Plaintiffs have not failed to plead any facts establishing that ANPAC Engaged In Predicate Acts

Plaintiff have analogized their case facts with the prosecution of the Gutschlag case supra, resulting in the conviction of this former insurance claim administrator for numerous acts of racketeering, mail fraud, wire fraud, money laundering, and receiving stolen property, specifically over payments in Insurance premiums.

ANPAC denies that overcharging an Insurance premium constitutes a RICO predicate act. **TELL THAT TO THE PROSECUTOR WHO SUCCESSFULLY OBTAINED A RICO CONVICTION AGAINST GUTSCHLAG.**

Nevertheless, the Gutschlag Court is not the only court to have held that overcharges in consumer products when procured by a predicate act will support a RICO prosecution. See Bailey v. Atl. Auto. Corp., 992 F. Supp. 2d 560, 580-81 (D. Md. 2014) (Consumers who do not

get what they pay for suffer economic loss, and have standing to pursue a RICO claims. Here. Consumers paid for one vehicle, but got another.); Newcal Indus., 513 F.3d at 1055 (reversing dismissal of RICO claim alleging, inter alia, that plaintiff "paid a fraudulently inflated price to buy out certain accounts that were under flexed IKON contracts"); Canyon Cty., 519 F.3d at 976 ("[A] consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money."); Ellis v. J.P. Morgan Chase & Co., 950 F. Supp. 2d 1062, 1086-87 (N.D. Cal. 2013) ("Plaintiffs allege they have paid marked-up fees and thus satisfy RICO standing."); Stitt, 942 F. Supp. 2d at 954 (denying motion to dismiss on same basis).Cannon v. Wells Fargo Bank,, No. C-12-1376 EMC (N.D. Cal. Jan. 29, 2014) (sufficient allegations that the defendants' common purpose was to increase revenues "by forcing Plaintiffs and members of the Classes to pay artificially inflated premiums for flood and hazard insurance in order that Wells Fargo obtain a piece of the pie for commissions for securing overvalued insurance when no such services were performed); " . .alleged overpayment injury satisfied Article III's injury-infact requirement because "palpable economic injuries have long been recognized as sufficient to lay the basis for standing." Sierra Club v. Morton, 405 U.S. 727, 733–34 (1972); Pirozzi v. Apple, Inc., No. 12-cv-1529-YGR, 913 F. Supp. 2d 840, 847 (N.D. Cal. Dec. 20, 2012) ("Pirozzi I") ("Apple's arguments misconstrue the nature of Plaintiff's allegations . . . . Overpaying for goods or purchasing goods a person otherwise would not have purchased based upon alleged misrepresentations by the manufacturer would satisfy the injury-in-fact and causation requirements for Article III standing under RICO."); Klay v. Humana, Inc., 382 F.3d 1241, 1259 (11th Cir. 2004) (physicians had contracted with defendants to receive reimbursement for medical services, but defendants engaged in a scheme to underpay plaintiffs' reimbursements when compared to other market rates); Anza, 547 U.S. At 461 (discussing overpayment rubric in a RICO case); Other courts have also held that a plaintiff will state a RICO claim when she is charged for services not received. Lentz v. Pan Am. Corp., No. 90-2181, 1991 WL 240739 (E.D. Pa. Nov. 12, 1991) (RICO injury stated for plane ticket where plaintiff was not provided services).

The foregoing more than establishes that ANPAC engaged in racketeering conduct when she repeatedly overcharged Plaintiff HOLLI premiums through multiple acts of wire fraud and which caused HOLLI resultant monetary injury. In addition, when ANPAC dispensed a lapse letter to an insurance data base, she did so with the purpose of extorting HOLLI from receiving competitive insurance prices and with the hopes that HOLLI would succumb to the double insurance premiums ANPAC imposed against HOLLI's accounts as

opposed to the quadruple insurance premiums HOLLI was quoted as a direct result of ANPAC's extortive and fraudulent publication conduct. Against GUTSCHLAG was convicted of racketeering conduct for stripping Virgina Tech of the right to competitive bids so that GUTSCHLAG could prolong his extortion mail fraud scheme.

Finally, ANPAC's failure to pay for vandalism to HOLLI's car was the direct result of the scheme to deprive HOLLI of the benefits HOLLI had paid for and to aid BOARDWALK's scheme to steal the biggest bang for their buck.

### 4. Plaintiff's Have Sufficiently Pled a Conspiracy

As stated supra, BAORDWALK would not have been able to get the biggest bang for their buck, if ANPAC had not conspired with BOARDWALK to impede HOLLI's ability to move Plaintiff's personal properties off of BOARDWALK's property before BOARDWALK exercised self help procedures on November 7, 2017 and thereby MOOTED any equity claims that Plaintiff's had initially pursued. See U.S. Fire Ins. Co. v. United Limousine Serv., 303 F. Supp. 2D 432, 444.45 (S.D.N.Y.2004) (**Conspiracy to engage In unlawful acts Is shown by being in a position that allows another defendant to carry out a given plan and aiding in the implementation of that plan.**). That ANPAC entered into an agreement with the BOARDWALK defendants to achieve ultimate objectives is established by the circumstantial evidence herein.

### D. Plaintiffs' Have Stated Electronic Funds Transfer Act Claims Against ANPAC

Plaintiffs have already addressed ANPAC's claim that Plaintiffs have failed to state an EFTA claim against ANPAC in their OPPOSITION BRIEF and JOINED MOTION TO STRIKE ANPAC's Motion To Vacate the DEFAULT entered against ANPAC, Doc. 37 commencing at page 5 of 9 and in the supporting declaration of HOLLI TELFORD at Doc.38 and the five attachments thereto. Plaintiffs incorporate by reference thereto the foregoing documents as if fully set forth herein and in support of their claim that they have not failed to state an EFTA claim against ANPAC.

Summarizing, ANPAC claims that the EFTA is not applicable to ANPAC. HOLLI claims that it does because if ANPAC is not construed as a financial institution pursuant to the banking act, then ANPAC clearly is "any other person who, directly or indirectly, holds an account belonging to a consumer." 15 U.S.C. §1693a (9). 12 C.F.R. §205.2(i). ANPAC further states that she cannot be construed as a financial institution because ANPAC did not

issue HOLLI and Access Device. As explained in HOLLI's OPPOSITION BRIEF, Doc. 37, @ pg 6:   See 12 CFR§ 205.2. Definitions.

For purposes of this part, the following definitions apply:
(a) (1) Access device means a card, code, **or other means of access to a consumer's account,** or any combination thereof, that may be used by the consumer to initiate electronic fund transfers.
(2) **An access device becomes an accepted access device when the consumer:** (1) Requests and receives, or signs, or uses (or **authorizes another to use) the access device to transfer money between accounts** or to obtain money, property, or services.

HOLLI argued that the access device was the Easy Pay contract that HOLLI signed at Doc. 42-3, at **PageID #: 401 only,** given PageID #: 402 is a forgery and therefore not enforceable.

Plaintiff's have therefore shown that ANPAC was indeed issued an access devise under the specific terms set forth therein to only draw certain amounts of money.

ANPAC then points to the access devise HOLLI gave ANPAC and then ANPAC fraudulently denies that the access device ie. the easy pay contract, limited the amounts of money that ANPAC could withdraw from HOLLI's account. In fact, a direct view of at Doc. 42-3, at **PageID #: 401 only, shows on its face that ANPAC was only authorized to pull $509 annually for HOLLI's homeowners policy and $172 every 6 months for HOLLI's auto policy from HOLLI's bank account. SO THE AUTHORIZATION WAS IN FACT LIMITED.**

ANPAC then presents the **FORGED TERMS PAGE ANPAC constructed less than one week ago** in preparation for her unauthorized motion to dismiss and which **puts forth terms that are in violation of federal policy under the EFTA. As stated supra,**

See **15 USC § 1693e. Preauthorized transfers**
(a) **A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing (emphasis added), and a copy of such authorization shall be provided to the consumer when made.**

ANPAC's **FORGED TERMS PAGE at PageID #: 401,** purports to give ANPAC the sole choice to authorize the amounts to be charged to the consumer's account. ANPAC's terms page is not only VOID because its forged, but it is also void as in violation of federal policy.

### E. SOUTH DAKOTA LAW DOES APPLY TO PLAINTIFFS PROPERTY LOCATED IN THE STATE OF SOUTH DAKOTA

ANPAC argues in bad faith that because HOLLI's trailer is insured under an Idaho

17

policy that the state of South Dakota has not jurisdiction to resolve insurance claims over property located in this state. HOLLI disagrees. At the time the policy for the travel trailer was obtained ANPAC's Idaho agent knew the property would be parked for living purposes in the state of South Dakota. After phone communications discussing this issue and whether split policies would be need, ANPAC's agent, not HOLLI elected to join the trailer under the IDAHO policy instead of a separate policy in the state of Idaho. See email communication for this decision as exhibit "8" attached to the supporting Dec. of HOLLI. ANPAC's unilateral decision to insure Plaintiff's South Dakota properties under an Idaho policy does not default coverage or jurisdiction over Plaintiff's South Dakota properties in the State of Idaho. The trailer is shown to be registered in South Dakota. HOLLI has title to the South Dakota property. See exhibit "9" attached to supporting Dec. of Holli. Therefore HOLLI is entitled to insurance over her properties in South Dakota.

### F. VENUE IS THIS MATTER IS DETERMINED UNDER THE RICO STATUTE

Plaintiffs venue argument is pleaded in their FAC and they incorporate that argument herein.

### CONCLUSION

For all of the reasons stated herein, Plaintiffs OPPOSE ANPAC's motion to dismiss and seek to strike that document for all of the reasons set forth herein.

Dated: January 10, 2018        _____  _____
                                      MARTY NOBLE                HOLLI TELFORD

Certificate of Service will be accomplished through the ECH filing system.